# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

<table>
<tr><td>IN RE METLIFE INC. DERIVATIVE LITIGATION</td><td>)<br>)<br>)<br>)</td><td>Consol. C.A. No. 2019-0452-SG</td></tr>
</table>

## MEMORANDUM OPINION

Date Submitted:  May 11, 2020
Date Decided:  August 17, 2020

Kurt M. Heyman and Gillian L. Andrews, of HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; OF COUNSEL: Gustavo F. Bruckner and Samuel J. Adams, of POMERANTZ LLP, New York, New York, *Attorneys for Lead Plaintiffs.*

Blake A. Bennett, of COOCH AND TAYLOR, P.A., Wilmington, Delaware; OF COUNSEL: Lee Squitieri, of SQUITIERI & FEARON, LLP, New York, New York, and James S. Notis and Jennifer Sarnelli, of GARDY & NOTIS, LLP, New York, New York, *Attorneys for Plaintiffs*.

Raymond J. DiCamillo and Brian S. Yu, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Maeve O'Connor, Elliot Greenfield, Michael W. Gramer, and Catherine Walsh, of DEBEVOISE & PLIMPTON LLP, New York, New York, *Attorneys for Defendants and Nominal Defendant.*

GLASSCOCK, Vice Chancellor

In this matter, the Plaintiffs seek derivatively to hold several corporate fiduciaries liable to the corporation, for failure to adequately oversee the operation of the business. That business is MetLife, Inc. ("MetLife" or the "Company"), the prominent insurance and financial services corporation. The Defendant fiduciaries have moved to dismiss the derivative action for failure to make a demand on the directors under Delaware Chancery Rule 23.1, as well as under Rule 12(b)(6). Rule 23.1 protects the functioning of the corporate directors as decision-makers for the entity; under this model, it is the board's prerogative to bring a cause of action in the corporate behalf. Only where a plaintiff is able to plead with particularity circumstances raising a reasonable doubt that the board is able to exercise its business judgment to consider the proposed legal action is demand excused, and the plaintiff empowered to proceed derivatively on behalf of the corporation.

Here, the only reason advanced by the Plaintiffs that demand should be excused is that a majority of the demand board would themselves be liable in this action alleging a failure to oversee the business, and therefore the board could not fairly consider a demand. A corporate oversight claim under the *Caremark* rationale, however, is notoriously difficult for plaintiffs. I find that the Plaintiffs have failed to plead facts sufficient to imply director liability or otherwise to excuse demand under Rule 23.1.

The complaint alleges that a long-standing part of MetLife's business is to undertake other businesses' fixed-benefit pension obligations to employees, by agreeing to pay an annuity to the employee once the employee retires and benefits become payable. This business operation, which MetLife calls the Pension Risk Transfer Business, has been a part of the MetLife operation since 1921. Historically, MetLife has given notice to employee/annuitants of entitlement to benefits at the address provided to them by the employer, by letters sent when each employee turned 65 and again when the employee reached 70 years and six months of age (the "two-letter" policy). If the employee thereafter responded to the notice, the annuity payments would commence; if not, the Company would presume the employee was dead and ineligible for benefits.

This system was hardly foolproof—some employees were alive but not at the address provided. As technology has improved, better tools to identify and locate annuitants developed, including a computerized list of deceased American employees maintained by the U.S. Social Security Administration and called the Death Master File. That list enumerated those who had *died*, not those who remained alive; nonetheless, it enabled a cross-check against MetLife's assumptions of annuitant demise. According to the complaint, MetLife was slow to adopt this and other new technology, allowing the Company, wrongfully, to avoid payments to annuitants and, because of the erroneous assumptions of annuitant death, release

2

reserves associated with that annuitant into Company earnings. In fact, MetLife used the Death Master File to inform itself, in some cases, of annuitant death in order to *stop* making payments, but not in the Pension Risk Transfer Business to potentially refute assumptions of death, which allowed the Company to avoid *commencing* payments. Ultimately, in December 2017, MetLife revealed in a Form 8-K that it had discovered the weaknesses inherent in the two-letter policy, and that it would enhance identification of annuitants in the Pension Risk Transfer Business and "strengthen" reserves, and warned that the changes could be material to operations. Class action securities litigation followed, as well as regulatory actions by the states of New York and Massachusetts, which have resulted in many millions of dollars of fines and restitution payments imposed upon the Company. The complaint alleges that the Defendants failed to adopt these procedures in a timely way, and should be held liable for breach of duty.

The Defendant Directors here are protected by an exculpatory clause in the corporate charter. In order for me to find it sufficiently likely that they are liable so that demand is excused, therefore, the complaint must contain specific allegations of fact from which I may infer that the Director Defendants' actions or inaction were in bad faith; that is, in conscious disregard of their duties. I find, however, that the allegations that the Defendant Directors failed to ensure that the Company

3

supplemented or superseded the two-letter policy falls short of a specific pleading of bad faith. Demand is not excused, therefore, and this matter is dismissed.

## I. BACKGROUND[1]

*A. The Parties*

Nominal Defendant MetLife is a Delaware corporation with its headquarters in New York.[2]

The Plaintiffs in this consolidated class action were, at all relevant times, owners of MetLife common stock.[3]

The Consolidated Verified Stockholder Derivative Complaint (the "Complaint") names nine currently serving directors on the MetLife board of directors (the "Board") as Defendants. Defendant Cheryl W. Grisé has been a director since 2004.[4] Defendant Carlos M. Gutierrez has been a director since 2013.[5] Defendant David L. Herzog has been a director since 2016.[6] Defendant R. Glenn

---

[1] I draw all facts from the Plaintiffs' Consolidated Verified Stockholder Derivative Complaint, Docket Item ("D.I.") 24 (the "Complaint" or "Compl.") and documents incorporated therein. *See in re Morton's Rest. Grp., Inc. S'holder Litig.*, 74 A.3d 656, 658–59 (Del. Ch. 2013) (permitting consideration of documents incorporated into complaint in motion to dismiss). As discussed further below, all well-pled facts are considered true for the sake of this motion.

[2] Compl., ¶ 48.

[3] *Id.* ¶ 23.

[4] *Id.* ¶ 24. Grisé serves on the Audit Committee and the Compensation Committee. *Id.*

[5] *Id.* ¶ 25. Gutierrez serves on the Governance & Corporate Responsibility and Investment Committees. *Id.*

[6] *Id.* ¶ 26. Herzog serves as the chairman of the Audit Committee and as a member of the Finance & Risk, Executive, and Compensation Committees. *Id.*

Hubbard has been a director since 2007.[7] Defendant Edward J. Kelly, III has been a director since 2015.[8] Defendant William E. Kennard has been a director since 2013.[9] Defendant James M. Kilts has been a director since 2005.[10] Defendant Catherine R. Kinney has been a director since 2009.[11] Defendant Denise M. Morrison has been a director since 2014.[12] The Plaintiffs did not name three other current directors as defendants because those directors joined after the events at issue: Gerald L. Hassell, Diana McKenzie, and Michael A. Khalaf.[13] I refer to the nine current director Defendants and the three non-defendant directors together as the "Demand Board."

In addition to the nine current directors, the Complaint names five former directors. Defendant Hugh B. Price was a director from 2003 through 2014.[14]

---

[7] *Id.* ¶ 27. Hubbard serves on the Executive, Governance & Corporate Responsibility, Investment, and Finance & Risk Committees. *Id.*

[8] *Id.* ¶ 28. Kelly III serves as the chair of the Finance & Risk Committee and as a member of the Audit, Compensation and Executive Committees. *Id.*

[9] *Id.* ¶ 29. Kennard is the chair of the Investment Committee, and a member of the Executive and Finance & Risk Committees. *Id.*

[10] *Id.* ¶ 30. Kilts serves as the chair of the Compensation Committee, and serves as a member of the Executive, Governance & Corporate Responsibility and Investment Committees. *Id.*

[11] *Id.* ¶ 31. Kinney is a member of the Audit and Finance & Risk Committees. *Id.*

[12] *Id.* ¶ 32. Morrison is a member of the Compensation and Governance & Corporate Responsibility Committees. *Id.*

[13] *Id.* ¶ 32 n.10.

[14] *Id.* ¶ 33. During his Board tenure, Price served on the Audit and Compensation Committees. *Id.*

Defendant Alfred J. Kelly, Jr., was a director from 2009 through 2018.[15] Defendant Kenton J. Sicchitano was a director from 2003 through 2016.[16] Defendant Lulu C. Wang was a director from 2008 through 2016.[17] Defendant John M. Keane was a director from 2003 through 2014.[18] MetLife's certificate of incorporation contains a 102(b)(7) clause exculpating MetLife Directors from breaches of the duty of care.[19]

Defendant Steven A. Kandarian started with the Company in 2005 and became CEO in 2011 and Chairman of the Board in 2012.[20] Kandarian retired on April 30, 2019.[21]

In addition to Kandarian, the Complaint names six current and former officers of MetLife as defendants. Defendant William J. Wheeler was President, U.S.

---

[15] *Id.* ¶ 34. During his Board tenure, Kelly, Jr. served on the Audit, Compensation, and Finance & Risk Committees. *Id.*

[16] *Id.* ¶ 35. During his Board tenure, Defendant Sicchitano served on the Audit and Finance & Risk Committees. *Id.*

[17] *Id.* ¶ 36. During her Board tenure, Wang served on the Finance & Risk Committee. *Id.*

[18] *Id.* ¶ 37. During his Board tenure, Defendant Keane served on the Audit Committee. *Id.*

[19] *See* Opening Br. In Support of Defs.' Mot. To Dismiss Consolidated Verified Stockholder Derivative Compl., D.I. 33 ("Defs.' Opening Br."), at 13 n.7 ("Director Defendants are exculpated from personal liability for [a breach of the duty of care] claim under MetLife's Certificate of Incorporation to the full extent authorized by Section 102(b)(7) of the Delaware General Corporation Law."). The Defendants did not attach a copy of the certificate of incorporation to their papers, but the Plaintiffs do not dispute in the Complaint or in briefing that the charter contains a 102(b)(7) clause. *See* Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss, D.I. 35 ("Pls.' Answering Br."), at 52 ("Unlike the Director Defendants, however, the Officer Defendants are not exculpated by 8 Del. C. § 102(b)(7). . .").

[20] Compl., ¶ 39.

[21] *Id.* ¶¶ 7, 39.

Business, from 2011 through approximately 2015.[22] Defendant John C.R. Hele was MetLife's Executive Vice President and Chief Financial Officer from 2013 through 2017.[23] Defendant Steven J. Goulart is MetLife's Executive Vice President and Chief Investment Officer.[24] Defendant Maria Morris replaced Wheeler as head of MetLife's U.S. Business from April 2015 through June 2017.[25] Defendant Robin F. Lenna was the Executive Vice President of MetLife's Retirement and Income Solutions business and its previous unit known as the "CBF" business.[26] Defendant Wayne Daniel was MetLife's Vice President of U.S. Pensions.[27] Daniel was appointed in March 2014 and served in that position through December 2017 and reported to Defendant Lenna throughout that period.[28]

I refer to Defendants Kandarian, Grisé, Gutierrez, Herzog, Hubbard, Kelly III, Kennard, Kilts, Kinney, Morrison, Price, Kelly, Jr., Sicchitano, Wang, and Keane as the "Director Defendants." I refer to Defendants Wheeler, Hele, Goulart, Morris, Lenna and Daniel as the "Officer Defendants."

---

[22] *Id.* ¶ 40. Wheeler retired in 2015. *Id.*

[23] *Id.* ¶ 41. Hele retired in May 2018. *Id.*

[24] *Id.* ¶ 42.

[25] *Id.* ¶ 43.

[26] *Id.* ¶ 44. Lenna retired in March 2018. *Id.*

[27] *Id.* ¶ 45.

[28] *Id.*

7

*B. Factual Background*

### 1. MetLife's Pension Risk Transfer Business

MetLife is a global financial services company.[29] Approximately thirty-five percent of MetLife's earnings come from its business in the United States.[30] Its operations in the United States fall into three businesses: Group Benefits, Retirement and Income Solutions ("RIS"), and Property and Casualty.[31] The RIS division includes the "Pension Risk Transfer Business."[32] The Pension Risk Transfer Business has been a part of MetLife's U.S. business since 1921.[33] In this line of business, MetLife "acquire[s] the assets of defined benefit pension plans and convert[s] them into group annuity contracts."[34] Through this transaction, employers eliminate risks associated with carrying pension plans, and MetLife takes on primary responsibility for paying funds to the beneficiaries of those plans, or "annuitants," as they reach retirement age.[35] When payment obligations transfer to

---

[29] *Id.* ¶ 75.

[30] *Id.* ¶ 76.

[31] *Id.*

[32] *Id.* ¶¶ 75–77.

[33] *Id.* ¶ 76.

[34] *Id.* ¶ 75.

[35] *Id.* ¶¶ 75, 77, 79. Under the Internal Revenue Code Section 401, to close out a defined benefit plan such as a pension, the sponsor *must* either make a one-time lump sum payment to participants or provide an annuity purchased from an insurer through a plan such as MetLife's Pension Risk Transfer Business. *Id.* ¶ 78.

MetLife, the employer makes a per-annuitant up-front payment to cover the minimum group annuity reserve.[36]

Having assumed the obligation to pay annuitants, MetLife relies on information provided by the employer to administer the group annuity contract and to make payments under it.[37]  Because the group annuity contracts are transactions between the employer and MetLife, the annuitants themselves are often unaware that their pension obligations have transferred.[38]

According to the Complaint, the Pension Risk Transfer Business is an important line of business for MetLife.  In 2014, Defendant Daniel, then Head of U.S. Pensions, called the Pension Risk Transfer Business "a core element of MetLife's business . . . for over 90 years."[39]  He noted that the Pension Risk Transfer Business has a forty-five percent market share of this financial service in the United States.[40]  As of June 2016, MetLife was managing approximately $38 billion in transferred pension liabilities.[41]  Several other Defendants acknowledged the market

---

[36] *Id.* ¶ 82.

[37] *Id.* ¶ 80.

[38] *Id.* ¶ 81.

[39] *Id.* ¶ 83.

[40] *Id.*

[41] *Id.*

share enjoyed by MetLife and indicated that the $1.5 to $2 billion annual sales from the Pension Risk Transfer Business made it an attractive line of business.[42]

One of MetLife's responsibilities in operating its group annuity contracts in the Pension Risk Transfer Business is to identify when annuitants are entitled to begin receiving payments and when those annuitants die.[43] This process is important because MetLife is legally and contractually obligated to maintain adequate funds in pension reserve accounts to pay all future claims and liabilities arising from the group annuity contracts.[44] Once an annuitant is deemed deceased, however, MetLife may release the benefits related to that annuitant into earnings.[45]

For many years, MetLife maintained the following process for identifying when it owed annuitants benefits. First, MetLife acquired the addresses of the annuitants from the employer at the time it acquired the pension obligations.[46] It generally did not attempt to maintain contact with the annuitants, seek updated contact information, or verify that the addresses on file were current.[47] MetLife sent two letters to the annuitants at the address it had on file from the employer.[48] It sent

---

[42] *Id.* ¶ 84.

[43] *See id.* ¶ 86.

[44] *See id.*

[45] *Id.* ¶ 90.

[46] *Id.* ¶ 88.

[47] *Id.* ¶¶ 87–88.

[48] *Id.* ¶ 87.

the first letter when the annuitant reached age 65, and the second letter when the annuitant reached age 70½.[49] If it received no response to the first letter, it presumed the annuitant had deferred retirement benefits beyond the normal retirement date.[50] If it received no response to the second letter, it labeled the annuitant "Presumed Dead" and released funds associated with that annuitant from the reserve accounts.[51] MetLife made no follow-up efforts to confirm these presumptions, even if the letters were returned undeliverable.[52] As will be described in more detail below, the two-letter notification procedure used to locate annuitants in the Pension Risk Transfer Business led to repercussions and financial consequences for the Company.

### 2. Plaintiffs' "Red Flags" of Inadequate Contact Procedures in the Pension Risk Transfer Business

In the Complaint, the Plaintiffs identify seven items they contend should have been "red flags" to the Board regarding the inadequacy of the two-letter notification procedure in the Pension Risk Transfer Business.

---

[49] *Id.*

[50] *Id.* ¶ 89.

[51] *Id.* ¶ 90.

[52] *Id.* ¶ 87.

11

### a. Item 1: Regulatory Guidance from the New York State Department of Financial Services

The New York State Department of Financial Services (the "NYDFS") is MetLife's primary government regulator.[53] Allegations of unfair trade practices in the life insurance industry spurred the NYDFS to undertake an inquiry regarding life insurance benefits.[54] In December 2011, the NYDFS issued a report finding that some insurers, including MetLife, had retained money that ought to have been paid to life insurance beneficiaries or policy holders.[55] This report found that "life insurers should regularly match life insurance policies against a reliable death list, rather than just waiting for claims to be filed."[56] The insurers that undertook this matching process discovered significant numbers of payees for whom claims had not been filed, resulting in large additional payouts of benefits.[57] In other words, per the NYDFS report, insurers whose benefits pay on death—as opposed to the annuity payments at issue here, that *terminate* upon death—should employ a reliable death list.

Based on Section 308 of the New York Insurance Law, the NYDFS advised that:

---

[53] *Id.* ¶ 96.

[54] *Id.* ¶ 94.

[55] *Id.*

[56] *Id.*

[57] *Id.*

> a cross-check of all life insurance policies, annuity contracts, and retained asset accounts on [insurers'] administration data files, including group policies for which an insurer maintains detailed insured records, should be performed with the latest updated version of the U.S. Social Security Administration's Death Master File ("SSA-DMF") . . . to identify any death benefit payments that may be due under life insurance policies, annuity contracts, or retained asset accounts as a result of the death of an insured or contract or account holder. . .[58]

The SSA-DMF referenced above is the federal government's master list of the deceased.[59] While the Complaint does not state whether the SSA-DMF is comprehensive, it describes it as "a computer database file made available since 1980 that contains information on over 83 million deaths dating back to 1962 . . . organized by name, birthdate and Social Security number. . ."[60] The report also found that some insurers utilized the SSA-DMF but *only* in conjunction with stopping annuity payments and *not* to determine if death benefit payments were due.[61] In 2011, MetLife responded to a request from the NYDFS to match its administrative records to the SSA-DMF and as a result "discovered $112 million in unpaid benefits on the Company's books that were owed to annuitants, beneficiaries, or state unclaimed property divisions."[62]

---

[58] *Id.*

[59] *Id.* ¶ 93.

[60] *Id.*

[61] *Id.* ¶ 94.

[62] *Id.* ¶ 95.

### b. Item 2: Investigative Hearing Testimony Before State Insurance Commissioners

In 2008, the California Insurance Commissioner's Office began investigating whether insurers had adequate controls in place to monitor their accounts to comply with unclaimed property laws.[63] A number of MetLife executives testified at investigative hearings in California and Florida in 2011 "on topics including life insurance and individual and group annuities."[64] Todd Katz, MetLife's Executive Vice President of U.S. Business Insurance Products, testified that MetLife utilized the SSA-DMF in the RIS division and in the Pension Risk Transfer Business.[65] However, the RIS division used the SSA-DMF only to determine whether annuitants had died for the purposes of stopping retirement payments; the RIS division did not use the SSA-DMF to check whether annuitants presumed dead were in fact dead.[66] Katz testified that MetLife had been using the SSA-DMF in this manner since the late 1980's and that it conducted a matching process once a month.[67]

Further testimony in these investigations showed that MetLife had a formalized process to use the SSA-DMF in its group annuity line of business, and that when the SSA-DMF showed that someone was deceased, MetLife passed that

---

[63] *Id.* ¶¶ 99–100.

[64] *Id.* ¶ 101.

[65] *Id.* ¶ 102.

[66] *Id.*

[67] *Id.*

14

information along to its other lines of business.[68]  In other words, MetLife used the SSA-DMF to find deceased annuitants so that it could stop payments, but it did not use the SSA-DMF as a check on the presumption that an annuitant was actually deceased after it sent the two notice letters, without reply, described above.[69]

### c. Item 3: The 2012 Regulatory Settlement Agreement

The investigations by state insurance commissioners and the regulatory guidance described above culminated in a Regulatory Settlement Agreement (the "RSA") between MetLife and several states' insurance regulators.[70]  The RSA stated that the investigations had uncovered issues with funds being timely paid to beneficiaries in accordance with state insurance and unclaimed property laws.[71]  The report identified "life insurance and endowment policies, annuities, [and] 'Retained Asset Accounts'" as areas with payment issues.[72]  The RSA focused on "the Regulators' findings that [led] to concerns about MetLife's death benefit practices."[73]

---

[68] *Id.* ¶ 103.

[69] *Id.* ¶ 104.

[70] *Id.* ¶ 107.

[71] *Id.*

[72] *Id.*

[73] *Id.* ¶ 110.

The RSA specifically identified MetLife's practice of using the SSA-DMF to terminate benefits but not to verify whether death benefits should be paid.[74] The RSA noted the $112 million of unpaid death benefits that MetLife discovered as a result of the NYDFS regulatory guidance.[75] Ultimately, according to the Complaint, under the RSA, "MetLife agreed to pay $438 million over the span of 17 years and pay an additional $40 million for the costs of the investigation by the various states."[76] MetLife agreed, as a part of the RSA, to implement internal policies to help identify beneficiaries.[77] It committed to conduct a "Thorough Search," a defined term that meant it would now utilize a variety of available methods to discover and contact potential beneficiaries.[78] The Thorough Search required MetLife to use "any methodology believed likely to locate a Beneficiary," including "best efforts to identify . . . a current address for the Beneficiary based upon the Company's records," a duty to "update the address using online search or locator tools," contact attempts by telephone and email, and a final certified mailing.[79]

---

[74] *Id.*

[75] *Id.*

[76] *Id.* ¶ 111. The Defendants disagree that MetLife agreed to pay $438 million in payments in connection with the RSA. For the purposes of this motion, however, I consider the Plaintiffs' allegations as true.

[77] *Id.*

[78] *Id.* ¶ 112.

[79] *Id.*

MetLife denied in the RSA that it had violated any insurance or unclaimed property laws.[80]

Notably, the RSA specifically excluded MetLife's Pension Risk Transfer Business.[81] It did so by defining "annuity contract" as "a fixed or variable annuity contract *other than a fixed or variable annuity contract issued to fund an employment-based retirement plan where MetLife is not committed by the terms of the annuity contract to pay death benefits* to the beneficiaries of specific plan participants."[82] Thus, the "Thorough Search" MetLife agreed to conduct under the RSA applied to its life insurance and death benefits practices, but it did not apply to the Pension Risk Transfer Business.[83] The Plaintiffs allege that "[i]t is highly likely that such exclusion was specifically approved by MetLife's then-Board."[84] The

---

[80] *Id.*, Ex. C, Regulatory Settlement Agreement ("RSA"), *Recitals* ("[MetLife] denies any wrongdoing or any violation of the Unclaimed Property Laws or the Insurance Laws of any of the Signatory States or any other applicable law, but in view of the complex issues raised and the probability that long term litigation and/or administrative proceedings would be required to resolve the disputes among the Parties hereto, [MetLife] and the Signatory States desire to resolve differences between the Parties as to the interpretation and enforcement of the Insurance Laws and the Unclaimed Property Laws and all claims that the Departments have asserted or may assert with respect to [MetLife's] claim settlement practices based on the use, or lack of the use, of the [SSA-DMF] or any other source or record maintained by or located in [MetLife's] records regarding the death of an Insured, Accountholder, Annuity Contract Holder, or annuitant[.]").

[81] *Id.* ¶ 113.

[82] *Id.* (emphasis added). The double negative notwithstanding, the Complaint avers that the RSA excluded the Pension Risk Transfer Business. *Id.* ("MetLife *specifically negotiated* with Regulators to exclude pension risk transfer annuitants from the 2012 RSA. . ." (emphasis in Complaint)).

[83] *See id.*

[84] *Id.*

Pension Risk Transfer Business continued using the two-letter contact procedure.[85] Testimony from MetLife executives in the investigations suggests that MetLife's management considered adopting enhanced contact practices for the Pension Risk Transfer Business, but decided not to do so.[86] Although the RSA ultimately concerned MetLife's *death* benefit practices in its life insurance business, the Plaintiffs allege that the regulatory actions ought to have revealed the need for change in the Pension Risk Transfer Business because the regulators had "specifically admonished [MetLife] for near identical administrative procedures in an analogous line of business."[87]

Of the ten Director Defendants on the Board at the time of the RSA in 2012, four are members of the Demand Board.[88] According to the Complaint, three more Demand Board directors joined in 2013 and 2014, after the RSA but while the RSA's "implementation period" remained ongoing.[89]

---

[85] *Id.* ¶ 114. The Plaintiffs point out that MetLife improved its procedures for annuitants who entered contracts directly with MetLife and thus knew MetLife was responsible for benefits, but left procedures unchanged for the Pension Risk Transfer Business contracts, in which annuitants might not know MetLife was responsible for their plans. *Id.* ¶ 115.

[86] *Id.* ¶ 116 (Katz testifying to insurance regulators that "[g]enerally in a similar way, we talked about using it in the annuity business"; and "we do have a variety of systems and procedures across our business that have been developed over some period of time that do inform other product areas.").

[87] *Id.* ¶ 118.

[88] *Id.* ¶ 117.

[89] *Id.* ¶ 213. I note that the Plaintiffs include Kandarian in this group of seven, though they do not allege that Kandarian was on the Demand Board.

18

### d. Item 4: The New York Class Action

Later in 2012, MetLife, Kandarian, and four members of the Demand Board were named defendants in a New York class action lawsuit, involving the issues addressed in the RSA.[90] In the answer filed in that lawsuit, they affirmed, "MetLife has accessed the SSA-DMF for specific purposes since the 1980s."[91]

### e. Item 5: The Department of Labor Investigation and MetLife's Pilot Program

In 2015, the U.S. Department of Labor ("DOL") opened an investigation in response to pensioners asking why they were not receiving pension payments.[92] Spurred by the DOL investigation, in December 2017 MetLife launched a discrete internal program (the "Pilot Program") that searched for its Pension Risk Transfer Business annuitants using methods beyond the Company's traditional two-letter notice procedure.[93] The Pilot Program's goals were to maintain contact with annuitants prior to their expected retirement dates as well as to "utilize more robust procedures to locate and establish contact with deferred participants who have not yet claimed a pension benefit."[94] The Pilot Program revealed that using additional contact methods resulted in the discovery of a great number of living annuitants

---

[90] *Id.* ¶ 120.

[91] *Id.*

[92] *Id.* ¶ 121.

[93] *Id.*

[94] *Id.* ¶ 123.

19

owed benefits.[95]   The Board discussed the findings from the Pilot Program at a meeting in January 2018.[96]

### f. Item 6: The Toland Litigation

In 1994, a former Martindale-Hubbell employee retired.[97]  MetLife owed him retirement benefits, but it did not notify him he was eligible until 2012.[98]  He died in 2013.[99]  In 2016, his estate brought a FINRA arbitration against MetLife.[100]  MetLife stated that it did not possess a current address prior to 2012.[101]

### g. Item 7: The Internal Auditor's Report

In September 2016, MetLife's Executive Vice President & Chief Auditor presented the Audit Committee with an "Internal Auditor's Report."[102]  According to the report, the internal audit department had reviewed the "Corporate Benefits

---

[95] *Id.* ¶ 122.  The Plaintiff alleges that, "the pilot program determined that 42% of the 750 annuitants [i.e. the sample size] in the pilot were alive, underscoring the gross inadequacy of MetLife's policies and procedures."  *Id.*

[96] *Id.*  According to the Complaint, all Director Defendants attended except for Morrison.  *Id.*

[97] *Id.* ¶ 124.

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] *Id.* ¶ 125.

[102] *Id.* ¶ 128.  "Defendants Sicchitano, Grisé, Kinney, Kelly, Jr., and Kelly, III all served on the Audit Committee and attended the September 26, 2016 meeting where this Internal Auditor's Report was presented."  *Id.* ¶ 131.

Funding's … [Annuity Customer Experience] Platform Closeout Implementation and Administration processes."[103] The Internal Auditor's Report stated:

> [C]ontrol weaknesses were identified over several areas, including contract accuracy, manual certificate mailings, and retirement letter mailings (e.g. age 65 and 70.5). Opportunities exist to enhance existing controls to ensure timely processing of held and suspended payments as well as retirements. Additionally, management should enhance procedures to clearly identify when transaction processing for a contract transfers to the Closeout Administration team.[104]

The Internal Auditor's Report set a target date of December 31, 2016 to address the problem.[105] The Audit Committee took no further action regarding the report and did not follow-up on the identified control weaknesses to see if they had been remedied.[106]

According to the Complaint, two other internal MetLife activities indicate that the Company had the opportunity to address the two-letter notification procedure. A "valuation system upgrade," complete by September 2015, revisited policies regarding "reserve treatment of lives that are deferred past their normal retirement age (i.e. age 65-70)."[107] MetLife did not upgrade the policies for the Pension Risk

---

[103] *Id.* ¶ 129 (alteration in Complaint).

[104] *Id.* ¶ 130.

[105] *Id.* ¶ 133.

[106] *Id.*

[107] *Id.* ¶ 136.

Transfer Business.[108]  Additionally, no procedure ensured that annuitants "presumed dead" were sent a proof-of-life request, regardless of whether the annuity contract required such a request.[109]

### 3. MetLife's Board Committees and Codes of Conduct

Several Board committees were involved in overseeing operations and making risk evaluations for the Company, including the Audit Committee, the Compensation Committee, and the Finance & Risk Committee.[110]  Each committee possessed internal formalized codes of conduct that outlined its duties and responsibilities.[111]  According to the Plaintiffs, abiding by these codes would have led the committees to uncover and evaluate the shortcomings in the Pension Risk Transfer Business.

The Audit Committee "oversees the Company's compliance with legal and regulatory requirements."[112]  It "reviews with management, the internal auditor and the independent auditor, the Company's system of internal control over financial reporting. . ."[113]  The Audit Committee's charter reiterates these directives.[114]  The

---

[108] *Id.*

[109] *Id.* ¶ 137.

[110] *Id.* ¶ 58.

[111] *Id.* ¶ 59.

[112] *Id.* ¶ 60.

[113] *Id.*

[114] *Id.* ¶ 61 (according to its charter, the Audit Committee evaluates "the adequacy and effectiveness of the Company's internal control over financial reporting, including any significant

Audit Committee also receives updates from management and the auditors about the "status of any remediation plans for any material weaknesses and significant deficiencies in the design and operation of internal control over financial reporting."[115] It is responsible for discussing internal controls, financial reporting, and any discrepancies in these areas with both management and the auditors.[116] Additionally, the Audit Committee will discuss risk assessment and address material communications from regulators and government agencies that relate to the Company's financial statements.[117]

The Compensation Committee approves the CEO's compensation and evaluates the CEO's performance in light of compensation objectives.[118] It also approves compensation of other executive officers.[119] This involves evaluating compensation programs to ensure they do not encourage excessive risk-taking.[120]

---

deficiencies or material weaknesses in the design or operation of internal control over financial reporting that could adversely affect the Company's ability to record, process, summarize and report financial information.").

[115] *Id.*

[116] *Id.*

[117] *Id.*

[118] *Id.* ¶ 63.

[119] *Id.*

[120] *Id.* ¶ 64.

The Compensation Committee may seek recoupment of earnings if the employee engages in misconduct.[121]

The Finance & Risk Committee oversees risk in all areas of MetLife's business.[122] This includes financial matters, capital structure, plans, policies, and strategic actions.[123]

Several internal codes of conduct at MetLife also govern the Defendants' behavior. The Director Defendants were under the Director's Code of Business Conduct and Ethics, which required reporting "any violations of law or governmental rule or regulation. . ."[124] The Officer Defendants were under MetLife's Code of Conduct, which required, among other things, that officers "[b]e aware of . . . legal and regulatory requirements" and "[d]isclose or raise concerns about any potential violations of law or policy. . ."[125] Finally, MetLife's Financial Management Code of Professional Conduct, which applied to Defendants Kandarian and Hele, required that they "take personal responsibility for conducting the business endeavors of MetLife fairly, [and] promote a culture of honesty and accountability.

---

[121] *Id.* ¶ 65.

[122] *Id.* ¶ 67.

[123] *Id.*

[124] *Id.* ¶¶ 69–70.

[125] *Id.* ¶¶ 71–72.

. ."[126] This included the responsibility to "provide appropriate disclosures to stakeholders," "[c]omply with applicable laws, rules and regulations," "monitor and improve, MetLife's processes to maintain effective internal control over financial reporting," and to "seek at all times to present all reasonably available material information on a timely basis to management and others. . ."[127]

### 4. Repercussions from the Pension Risk Transfer Business

The effect of the two-letter notice procedure in the Pension Risk Transfer Business meant that the letters sometimes failed to reach annuitants, with the result that MetLife would erroneously mark those annuitants Presumed Dead and release the funds associated with their retirement into income instead of holding those funds in reserve assets.[128] In short, some funds properly marked as liabilities transformed, due to the inadequate notice procedures, into assets.[129] In December 2017, MetLife first disclosed these shortcomings in an 8-K, announcing that it would be implementing new notice procedures that would require strengthening its reserve assets.[130] According to the 8-K, these new procedures could be "material to [MetLife's] results of operations."[131] The Company followed up with an investor

---

[126] *Id.* ¶ 73.

[127] *Id.*

[128] *Id.* ¶ 152.

[129] *Id.* ¶ 153.

[130] *Id.* ¶ 154.

[131] *Id.*

conference call, at which Defendant Hele reiterated that the updated outreach procedures could lead to "material" changes in "results of operations."[132] The *Wall Street Journal* published an article addressing the announcement, and it calculated, based on the information provided in the notice, that the changes could result in overdue benefits of up to $540 million.[133]

Litigation ensued. MetLife was the subject of a securities class action in February 2018 in the Eastern District of New York.[134] Also in February 2018, the NYDFS examined MetLife's Pension Risk Transfer Business, and in January 2019, MetLife entered into a "settlement requir[ing] MetLife to pay a $19.75 million fine to the state and $189 million in restitution to affected retirees."[135] This 2019 settlement agreement listed a paragraph of New York statutory and administrative laws that the NYDFS asserted MetLife had violated.[136] Additionally, in June 2018, the Enforcement Section of the Massachusetts Securities Division sued MetLife, in part regarding its Pension Risk Transfer Business procedures, resulting in a payment

---

[132] *Id.* ¶ 155.

[133] *Id.* ¶ 156.

[134] *Id.* ¶ 141.

[135] *Id.* ¶ 146–47.

[136] *Id.*, Ex. A., *In re Metropolitan Life Ins. Co.*, No. 2019-0002-S, Consent Order, ¶ 5, Violations.

26

of $1 million in fines for violation of Massachusetts state laws.[137]  An SEC inquiry

is ongoing.[138]

On January 29, 2018, MetLife issued a press release announcing it would

revise previous financials to strengthen its reserves in an amount between $525

million and $575 million, including a $165 million to $195 million impact on its

2017 net income.[139]  In this press release, MetLife also disclosed the NYDFS

examination and the SEC inquiry.[140]

In an earnings call—disclosed in a February 2018 8-K—MetLife outlined

steps to remediate the inadequate annuitant contact procedures, which it labeled a

"material weakness."[141]  In communications with the public, MetLife expressed that

the Company was "deeply disappointed that we fell short of our own high

standards."[142]  On a conference call in February 2018, Kandarian called the

procedures in the Pension Risk Transfer Business an "operational failure that never

should have happened," and "deeply embarrassing."[143]  Kandarian noted on this call

that the "operational failure" had been ongoing for approximately twenty-five

---

[137] *Id.* ¶¶ 143–45.

[138] *Id.* ¶ 148.

[139] *Id.* ¶ 157.

[140] *Id.*

[141] *Id.* ¶ 159.

[142] *Id.* ¶ 161.

[143] *Id.* ¶ 164.

years.[144]  The superintendent of the NYDFS noted that MetLife's ongoing failure was a failure "to adapt its protocols for paying claims in the modern era of worker mobility: 'What used to be standard protocol for finding retirees who are owed benefits is no longer sufficient.'"[145]

CFO Hele retired in May 2018—according to the Plaintiffs, his retirement was in response to these events.[146]  Internal documents show the Company estimates paying around $50 million in legal and consulting fees for legal and corrective measures.[147]  In its 2017 10-K, released in March 2018, MetLife reiterated that it had "identified material weaknesses in MetLife, Inc.'s internal control over financial reporting related to the administrative and accounting practices of certain [RIS] group annuity reserves," and, as a result, "MetLife, Inc. has not maintained effective internal control over financial reporting as of December 31, 2017[.]"[148]  These material weaknesses implied that MetLife's previous statements, dating back for years, that its reserve funds were sufficient and its financials accurately stated, were in fact inaccurate.[149]

---

[144] *Id.* ¶ 165.

[145] *Id.* ¶ 170.

[146] *Id.* ¶ 173.

[147] *Id.* ¶ 174.

[148] *Id.* ¶ 176.  This included overstating the Company's revenue and income.  *Id.* ¶ 177.

[149] *Id.* ¶¶ 181–87.

In total, the inadequate procedures in the Pension Risk Transfer Business led to the nonpayment of retirement benefits for 13,500 living retirees, or around 2.25% of the 600,000 retirees whose pensions MetLife managed.[150] MetLife presumed these 13,500 annuitants dead and released reserve funds associated with their pension benefits into income, resulting in "an approximately $510 million overstatement of MetLife's profits."[151]

The Plaintiffs allege that these events constituted a breach of the Defendants' fiduciary duties, resulting in both reputational and monetary damages to the Company.[152] The Plaintiffs also plead demand futility, arguing that a majority of the Demand Board are "interested" in the litigation solely, as I read the Complaint, "because they face a substantial likelihood of liability for their role in MetLife's improper misconduct."[153] In addition to claims of breach of fiduciary duty, the Plaintiffs allege unjust enrichment against all Defendants and corporate waste against the Director Defendants.[154]

---

[150] *Id.* ¶ 179.

[151] *Id.*

[152] *Id.* ¶¶ 195–211.

[153] *See id.* ¶¶ 212–30.

[154] *Id.* ¶¶ 249–74.

*C. Procedural History*

Prior to consolidation, individual plaintiff groups filed separate books and records actions under 8 *Del. C.* § 220 in the first half of 2018.[155] The resulting fiduciary actions were consolidated on August 16, 2019.[156] The Plaintiffs filed the consolidated Complaint on September 9, 2019.[157] The Defendants filed their Motion to Dismiss on October 11, 2019.[158] After briefing completed, I heard argument on May 5, 2020, after which I received supplemental submissions from the parties on May 11, 2020.[159] I considered the matter fully submitted at that time.

## II. LEGAL STANDARDS

The Plaintiffs have filed a derivative complaint on behalf of the Company. Under Delaware law, "[t]he business and affairs of every corporation . . . shall be managed by or under the direction of a board of directors. . ."[160] As such, it is typically the board's prerogative to determine whether the corporation initiates and maintains a lawsuit.[161] In order "to displace the board's authority over a litigation

---

[155] *Id.* ¶¶ 188–91. The Plaintiffs allege the books and records produced by the Company were inadequate. *Id.* ¶¶ 192–94.

[156] Order for Consolidation of Cases, D.I. 21. The original cases were *Lifschitz v. Kandarian, et al.*, C.A. No. 2019-0452-SG and *Felt v. Daniel, et al.*, C.A. No. 2019-0594-SG.

[157] Consolidated Verified Stockholder Derivative Compl., D.I. 24.

[158] Defs.' Mot. to Dismiss Consolidated Verified Stockholder Derivative Compl., D.I. 32.

[159] D.I. 45.

[160] 8 *Del. C.* § 141(a).

[161] *Hughes v. Hu*, 2020 WL 1987029, at *9 (Del. Ch. Apr. 27, 2020) ("Directors of Delaware corporations derive their managerial decision making power, which encompasses decisions

asset and assert the corporation's claim," a derivative plaintiff must do one of two things.[162]  Either the plaintiff may make a pre-suit demand on the board, requesting that it bring the action on behalf of the company, then demonstrate that the demand was wrongfully refused by the board, *or* the plaintiff may plead that such a demand would be futile because a majority of "the directors are incapable of making an impartial decision regarding such litigation."[163]

Where a plaintiff pleads demand futility, Court of Chancery Rule 23.1 requires the plaintiff to "allege with particularity . . . the reasons for the plaintiff's failure to obtain the action or for not making the effort [of placing a demand on the board]."[164]  To plead demand futility, this Court requires "particularized factual allegations" creating a "reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[165]  Thus, "the pleading burden imposed by Rule 23.1 . . . is more onerous than that demanded by Rule

---

whether to initiate, or refrain from entering, litigation, from 8 *Del. C.* § 141(a)." (quoting *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981))).

[162] *Id.* at \*10 (citing *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984)).

[163] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

[164] Ct. Ch. R. 23.1.

[165] *Rales*, 634 A.2d at 934.

12(b)(6)."[166] "Though a complaint may plead a 'conceivable' allegation that would survive a motion to dismiss under Rule 12(b)(6), 'vague allegations are . . . insufficient to withstand a motion to dismiss pursuant to Rule 23.1.'"[167] In sum, while a derivative plaintiff "need not plead evidence," she "must comply with stringent requirements of factual particularity that differ substantially from . . . permissive notice pleadings."[168] In meeting the pleading requirements under both rules, however, the plaintiff is entitled to all reasonable inferences in her favor.

Here, the Plaintiffs plead demand futility, arguing that a majority of the members of the Demand Board[169] face a substantial likelihood of liability regarding these matters and are therefore incapable of making the decision as to whether the Company should pursue the litigation.[170] The Plaintiffs' underlying theory of liability is a breach of fiduciary duty claim under *In re Caremark Int'l Inc.*,[171] based

---

[166] *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *6 (Del. Ch. Oct. 12, 2011) (internal alterations omitted) (quoting *McPadden v. Sidhu*, 964 A.2d 1262, 1269 (Del. Ch. 2008)).

[167] *Id.* (quoting *McPadden*, 964 A.2d at 1269). As explained in *In re Goldman Sachs Grp., Inc.*, "[t]his difference reflects the divergent reasons for the two rules: Rule 12(b)(6) is designed to ensure a decision on the merits of any potentially valid claim, excluding only clearly meritless claims; Rule 23.1 is designed to vindicate the authority of the corporate board, except in those cases where the board will not or (because of conflicts) cannot exercise its judgment in the interest of the corporation." *Id.*

[168] *Hughes v. Hu*, 2020 WL 1987029, at *10 (Del. Ch. Apr. 27, 2020) (citing *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984); *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000)).

[169] Defined in the factual recitation as Defendants Grisé, Gutierrez, Herzog, Hubbard, Kelly III, Kennard, Kilts, Kinney, Morrison and non-parties Hassell, McKenzie, and Khalaf.

[170] Compl., ¶¶ 212–30.

[171] 698 A.2d 959 (Del. Ch. 1996).

on the Board's lack of oversight, as well as claims for unjust enrichment and corporate waste secondary to a finding of a *Caremark* violation.[172] Because the Plaintiffs' allegations center on the Board's failure to act (rather than an affirmative Board decision), the demand futility test in *Rales v. Blasband*, described above, applies.[173] Under the *Rales* test, to plead that directors are interested in the litigation in a way that deprives them of independence, the Plaintiffs must allege facts showing that a majority of directors on the Demand Board face a "substantial likelihood of personal liability" in the action.[174] Mere "potential directorial liability is insufficient to excuse demand."[175] Of course, the fact that wrongdoing is alleged against the directors themselves or that directors are named defendants in an action does not by itself deprive them of independence;[176] otherwise, compliance with Rule 23.1 in derivative pleadings would be self-proving.

---

[172] In other words, the Plaintiffs allege that where salaries or bonuses are paid to fiduciaries who fail to act in compliance with *Caremark* obligations, that remuneration constitutes unjust enrichment or waste.

[173] *See Hughes*, 2020 WL 1987029, at *13 n.3 (collecting Delaware cases applying the *Rales* test when the underlying allegations against the board are based on lack of oversight). The parties agree that the *Rales* test applies, rather than the *Aronson* test, which deals with a subset of situations in which an act or decision by the demand board is at issue. Though not at issue here, Vice Chancellor Laster conducted a detailed examination of the interaction between the *Rales* and *Aronson* tests in *Hughes*, 2020 WL 1987029, at *9–13.

[174] *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993).

[175] *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *18 (Del. Ch. Oct. 12, 2011).

[176] *See Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at *27 (Del. Ch. June 15, 2011); *Jacobs v. Yang*, 2004 WL 1728521, at *6 n.31 (Del. Ch. Aug. 2, 2004).

## III. ANALYSIS

The Defendants have moved to dismiss on two grounds: first, under Rule 23.1, arguing that demand should have been made on the Board; and second, under Rule 12(b)(6), arguing that even if demand were excused, the Plaintiffs fail to state a claim upon which relief can be granted. "Courts assess demand futility on a claim-by-claim basis."[177] I examine the Rule 23.1 basis for each claim below. Finding that analysis dispositive, I need not consider the Rule 12(b)(6) basis for dismissal.[178]

Below, I address, with respect to each Count, whether the Complaint contains sufficient specific allegations from which I may infer a substantial likelihood of liability on the part of a majority of the Demand Board, thus excusing demand.

### A. Counts I and II: Breach of Fiduciary Duties

Under *Caremark*, "[t]he board of a Delaware corporation has a fiduciary obligation to adopt internal information and reporting systems that are 'reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law

---

[177] *Kandell ex rel FXCM, Inc. v. Niv*, 2017 WL 4334149, at *11 (Del. Ch. Sept. 29, 2017).

[178] *See In re Dow Chem. Co. Derivative Litig.*, 2010 WL 66769, at *1 n.1 (Del. Ch. Jan. 11, 2010) ("demand futility under Rule 23.1 is logically the first issue for all derivative claims and if plaintiffs cannot succeed under the heightened pleading requirements of Rule 23.1 ... there is no need to proceed to an analysis of the merits of the claim under Rule 12(b)(6).") (internal citations and alterations omitted).

and its business performance.'"[179]  For Rule 23.1 purposes, *Caremark* liability is a substantial likelihood for directors if the allegations of the complaint establish that "(a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[180]  These are typically described as the two "prongs" of a *Caremark* claim.

In Count I, the Plaintiffs allege the Director Defendants breached their fiduciary duties by "knowingly or intentionally failing or refusing to implement regulator-mandated remedial measures [prescribed for other business lines in the 2012 RSA] to MetLife's pension risk transfer business and knowingly or intentionally failing to put in place and/or monitor a reasonable system and controls to ensure the identification of unresponsive and missing group annuity annuitants and pension beneficiaries."[181]  The Plaintiffs also allege that the Board had "actual or constructive knowledge that MetLife's internal controls were inadequate" and "chose to do nothing about these deficiencies."[182]  According to the Plaintiffs, the

---

[179] *In re China Agritech, Inc. S'holder Derivative Litig.*, 2013 WL 2181514, at *18 (Del. Ch. May 21, 2013) (quoting *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 970 (Del. Ch. 1996)).

[180] *Hughes v. Hu*, 2020 WL 1987029, at *14 (Del. Ch. Apr. 27, 2020) (quoting *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006)).

[181] Compl., ¶ 233.

[182] *Id.* ¶ 234.

Board "consciously and in bad faith chose not to cause the Company to act in accordance with positive law."[183] The Plaintiffs allege that a majority of the Demand Board—seven members—served at the time of the 2012 RSA (or joined shortly thereafter during its implementation period) and so lack independence.[184] The Plaintiffs ultimately allege that a total of nine members of the Demand Board also lack independence due to their service on the Audit or Finance and Risk Committees at the relevant times.[185]

The language from the Complaint quoted above is phrased broadly and appears aimed at capturing both prongs of a *Caremark* claim. Thus, the Plaintiffs allege both that the Director Defendants failed to put a system of internal controls in place, *and* that they consciously disregarded evidence of corporate violation of positive law or consciously ignored the systematic inadequacies that kept such evidence from reaching them. Briefing and argument helped clarify the Plaintiffs'

---

[183] *Id.* ¶ 235.

[184] *Id.* ¶ 213. These members are Kandarian, Grisé, Gutierrez, Hubbard, Kinney, Kennard, and Kilts. *Id.* The Plaintiffs allege that "[a]t the time Plaintiff Lifschitz's complaint was filed, the Board was comprised of eleven directors: Grisé, Gutierrez, Hassell, Herzog, Hubbard, Kelly, III, Kennard, Khalaf (CEO), Kilts, Kinney, McKenzie and Morrison." *Id.* By my count, this lists twelve directors, not eleven. The Plaintiffs then allege that "More than half of the Board (7 out of 12 members) were members of the MetLife Board at the time of the 2012 RSA or shortly thereafter," and list Kandarian among that 7-member majority, even though they do not allege— because he retired in April 2019—that Kandarian was a member of the Demand Board.

[185] *Id.* The Plaintiffs implicate Director Defendants Herzog and Kelly, III in addition to the seven (or six) Director Defendants serving on the Board at the time of the RSA or joining shortly thereafter. *Id.* ¶ 222.

position, as they wisely focused solely on the second prong of *Caremark*.[186] To the extent the Plaintiffs attempt to put forward a claim under *Caremark's* first prong, I find that attempt fails.[187] It is clear from the Complaint that MetLife had an extensive network of internal controls.[188] The Plaintiffs claim here is really that the Board consciously failed to oversee and implement controls they knew were necessary to regulatory compliance, by failing to ensure that the Company applied the "Thorough Search" standard, to which it had agreed in the 2012 RSA, to the Pension Risk Transfer Business.[189] This bad-faith failure to act, per the Plaintiffs, led the

---

[186] *See* Pls.' Answering Br., at 24 ("Under the second prong of Caremark, [the Directors'] conscious disregard of those red flags amounts to non-exculpated bad faith breach of their fiduciary duties of oversight and loyalty."). Count II of the Complaint brings breach of fiduciary duty claims against the Officer Defendants. Compl., ¶¶ 240–48. I consider the Board's ability to consider Count II subordinate to Count I. The Plaintiffs do not argue that any Board members were beholden to management in a way that would disable them from evaluating those claims, assuming that they are not themselves likely subject to liability.

[187] In their briefing, the Plaintiffs sometimes blend the language of the two *Caremark* prongs, arguing that "[w]hen various matters of legal and regulatory importance arose, but no information was flowing to the Board or its Committees, the Director Defendants should have known that there were sustained and systematic failures of their oversight systems and controls." Pls.' Answering Br., at 44. But the standard for a *Caremark* claim through a systematic failure to implement controls is that the board "utterly failed to implement any reporting or information system or controls." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

[188] The Plaintiffs allege that MetLife has an Audit Committee, as well as a Finance and Risk Committee, and further alleges that these committees meet regularly (indeed, frequently), that they have internal codes of conduct, and that the Audit Committee receives reports from MetLife's internal auditor. Compl., ¶¶ 60–62, 67–68, 128–33. Moreover, the Plaintiffs specifically allege that other "red flags" such as the Pilot Program's results, reached the Board level through internal reporting systems. Compl., ¶ 122. Thus, to the extent the Plaintiffs allege the Board utterly failed to implement a reporting system, such an allegation is contradicted by other specific allegations in the Complaint.

[189] The Plaintiffs chiefly allege an oversight claim. However, some language in the Complaint suggests the Plaintiffs are alleging the Director Defendants purposefully caused the Company to violate the law. "Where directors intentionally cause their corporation to violate positive law, they

37

Company to violate various regulatory provision via its conduct of the Pension Risk Transfer Business.[190]

Director liability for an oversight claim under *Caremark* requires bad faith on the part of the directors (where, as here, they are exculpated from liability for breach of care).[191]  Inaction amounting to bad faith requires that "the directors *knew* that they were not discharging their fiduciary obligations."[192]  As is now "oft-repeated . . . a *Caremark* claim is among the hardest to plead and prove."[193]  Regarding the second *Caremark* prong—at issue here—a plaintiff can establish a board's bad faith by showing that it saw red flags related to compliance with law and consciously disregarded those flags.[194]  This Court has noted that "red flags are only useful when

---

act in bad faith." *Kandell ex rel FXCM, Inc. v. Niv*, 2017 WL 4334149 (Del. Ch. Sept. 29, 2017) (quoting *In re Massey Energy Co.*, 2011 WL 2176479, at \*20 (Del. Ch. May 31, 2011)).  The Complaint alleges the "Board . . . turned a blind eye to management's annuity nonpayment scheme." Compl., ¶ 16.  The Plaintiffs' allegation that comes the closest to such a "scheme" is the allegation that I must infer that the Board specifically approved MetLife's carving out the Pension Risk Transfer Business from the "Thorough Search" required for other lines of business by the 2012 RSA. *Id.* ¶ 113.  If this is the Plaintiffs' contention—that in 2012 the Board acted specifically to carve out the Pension Risk Transfer Business from a regulatory settlement *so that* MetLife could continue acting illegally in that line of business—there are no specific factual allegations supporting such a conclusion

[190] As I understand the Complaint, the Plaintiffs charge the Defendant Directors with permitting the Company to violate regulatory strictures, that is, to violate positive law.  The Plaintiffs do not appear to argue that Caremark can apply here to bad-faith failure to oversee business risk alone.

[191] *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

[192] *Id.* (emphasis added).

[193] *In re Clovis Oncology, Inc. Derivative Litig.*, 2019 WL 4850188, at \*12 (Del. Ch. Oct. 1, 2019).

[194] *Id.* at \*13 (citing *South v. Baker*, 62 A.3d 1, 16–17 (Del. Ch. 2012); *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at \*19 (Del. Ch. Oct. 12, 2011).

they are either waived in one's face or displayed so that they are visible to the careful observer," keeping in mind that "the careful observer is one whose gaze is fixed on the company's mission critical regulatory issues."[195]

The Plaintiffs run seven different "red flags" up the *Caremark* flagpole in the Complaint and in briefing. At oral argument, however, they contained their presentation to two of these red flags: the 2012 RSA and the 2016 Internal Auditor's Report.[196] I agree with the Plaintiffs' flag-parsing, and I focus chiefly on those two. However, mindful of the potential that notice of wrongdoing or lack of control communicated to the Board ought to be viewed cumulatively in order to assess potential bad faith, I group six of the red flag incidents into two related groups, and view them through a cumulative lens.[197]

---

[195] *Clovis*, 2019 WL 4850188, at *13 (quoting *Wood v. Baum*, 953 A.2d 136, 143 (Del. 2008); *In re Citigroup Inc. S'holders Litig.*, 2003 WL 21384599, at *2 (Del. Ch. June 5, 2003), *aff'd sub nom. Rabinovitz v. Shapiro*, 839 A.2d 666 (Del. 2003)).

[196] *See* Tr. of 5.5.20 Telephonic Oral Argument on Defs.' Mot. to Dismiss ("Oral Argument Tr."), at 33:8–15 ("We're going to focus on two of the red flags discussed in the complaint today.").

[197] The remaining purported "red flag" the Plaintiffs cite is an arbitration proceeding against the Company, the "Toland litigation." The Plaintiffs allege that an annuitant, Mr. Toland, was entitled to pension payments for many years after he retired, but MetLife did not pay annuities until one year before his death, presumably because the two-letter notification system failed. Compl., ¶ 124. His estate brought FINRA arbitration against MetLife. *Id.* The Plaintiffs appear to offer this "red flag" more to put a human face on the problem than to suggest oversight liability. There is no allegation that the arbitration with this single annuitant's estate reached the board level, nor is there reason to infer that it likely did so. The existence of this litigation does nothing to indicate director inaction in the face of a known duty.

### 1. "Red Flags" 1-4 (Regulatory Action and the 2012 RSA)

The Plaintiffs' first four "red flags" relate to regulatory action and subsequent securities litigation directed at MetLife in 2011 and 2012. These are fully described above; I restate the events briefly here. In 2011, MetLife executives testified at investigative hearings before state regulators related to life insurance and annuity practices.[198] That investigative action asked specific questions about MetLife's use of the Social Security "death list," the SSA-DMF.[199] In 2011, the NYDFS issued guidance to MetLife and other insurers that they should use the SSA-DMF to actively search for *death benefit claims*.[200] At the request of the NYDFS, MetLife conducted such a search and discovered $112 million in unpaid death benefits.[201] These investigations and the regulatory guidance culminated in MetLife's 2012 RSA with multiple states' insurance regulators, under which it agreed to pay $40 million to the states, distribute $438 million over 17 years for unpaid benefits, and implement policy changes in its death benefit notice procedures.[202] Those policy changes required a Thorough Search, under which MetLife "began using certified mail, electronic mail, the telephone, SSA-DMF, and online databases to identify and

---

[198] *Id.* ¶¶ 99–102.

[199] *Id.* ¶¶ 102, 104.

[200] *Id.* ¶ 94.

[201] *Id.* ¶ 95.

[202] *Id.* ¶¶ 107, 110–13.

contact annuitants."[203]    In the RSA, MetLife denied any legal violations.[204] Afterward, four members of the Demand Board were named in a class action securities lawsuit, apparently based on the facts underlying the RSA.[205]

Nothing in the investigations or the RSA put those who became aware of them on direct notice of deficiencies in the Pension Risk Transfer Business and its tracking of annuitants. That business was an old line at MetLife, and the two-letter notice system had been in place for years. Meanwhile, MetLife was also in the life insurance business, and was allegedly paying death benefits only when informed (by estate administrators or others) that an insured had died. Through the RSA, the NYDFS ensured that MetLife would take an active role, by monitoring the SSA-DMF and other means, in finding (and paying) decedent beneficiaries going forward.

The Plaintiffs consider—rightly, in my view—that life insurance and Pension Risk annuities are "analogous" lines of business within MetLife. Their argument is that anyone familiar with the RSA would conclude that it would also be prudent to use the SSA-DMF and other enhanced methods of contact like email, telephone, and online search tools as a negative check on the presumption that annuitants not

---

[203] *Id.* ¶ 113.

[204] *See* RSA, *Recitals*.

[205] Compl., ¶¶ 120, 217–18.

responding to the two notice letters were dead.[206] That it would occur to a prudent person that the SSA-DMF and updated contact procedures would be useful in that regard is plausible. As the Plaintiffs point out, the Superintendent of the NYDFS stated that use of the tools at hand was important in light of enhanced technology and increased residential mobility on the part of pensioners: "What used to be standard protocol for finding retirees who are owed benefits is no longer sufficient."[207] But the failure to recognize that use of the SSA-DMF in one way in one line of business made it wise to use it differently in another, and the failure to modernize other administrative contact procedures, even if those failures imply unwise or imprudent management, does not thereby also imply bad faith. I cannot assume the use of the SSA-DMF as a negative check on a death assumption for pension annuities is so strongly suggested by its use to identify life insurance beneficiaries that failure to make that logical leap is an indicator of bad faith. Plaintiffs ask me to impute to the Defendant Directors the knowledge that the state regulators believed that it was unlawful to avoid prompt payment of death benefits by ignoring the SSA-DMF and other opportunities to contact beneficiaries. Even if I do so, that would not imply that failure to use the SSA-DMF and those other

---

[206] *See* Pls.' Answering Br., at 12 ("While [the regulatory proceedings] focused on life insurance practices, these are the exact practices for which MetLife is now facing substantial liabilities in its RIS Unit"; therefore, MetLife should have "taken steps to ensure [it] was complying with that guidance across all of its insurance annuity and retained asset accounts, including the RIS Unit.").

[207] *Id.* ¶ 170.

modern contact methods *as a check on assumptions of death in the Pension Risk Transfer Business* was so clearly unlawful that a failure to ensure its application there amounts to bad faith.[208]

The other problem with relying on the RSA and the predicate investigations to serve as red flags displayed before the Director Defendants is that, even if the epistemological leap just referenced were appropriate, there are insufficient allegations from which I may infer that knowledge of such was presented to the Director Defendants themselves. The Complaint does not allege that the full Board received notice of any of the regulatory actions at the time. The Plaintiffs here, to their credit, made full use of Section 220 to inform their Complaint. In their briefing, the Plaintiffs state that "the 220 Documents, including Board minutes, are silent" about whether these regulatory actions "reached the Board's attention."[209] In the absence of specific facts indicating it was brought to the Board, the Plaintiffs rely on a theory of "constructive knowledge," alleging that it is "highly likely" the regulatory actions made it to the Board given their significant legal nature.[210] This

---

[208] *See Kandell ex rel FXCM, Inc. v. Niv*, 2017 WL 4334149, at *17 (Del. Ch. Sept. 29, 2017) (finding that it would be "perverse to hold directors responsible for knowledge of every regulation or law that might impact their entity, or for every policy undertaken by corporate employees; that is the basis for the scienter requirement and the focus on purported red flags implying director knowledge.").

[209] Pls.' Answering Br., at 39.

[210] Compl., ¶¶ 105, 113; *see* Pls.' Answering Br., at 39–45 (describing theory of "Constructive Knowledge of . . . Red Flags").

Court has generally rejected constructive knowledge of unlawful conduct as a theory in demand futility cases.[211]  Additionally, the Plaintiffs put great weight on the Company's codes of conduct and the Board committee charters to argue that various directors *should* have had knowledge or *should* have reported to the full Board, based on their tasked oversight.  "As numerous Delaware decisions make clear, an allegation that the underlying cause of a corporate trauma falls within the delegated authority of a board committee does not support an inference that the directors on that committee knew of and consciously disregarded the problem for purposes of Rule 23.1."[212]

In contrast to these constructive or "should-have" theories of knowledge, the Plaintiffs also allege that four members of the Demand Board were named defendants in a New York federal class action that concerned the same issues as the regulatory actions.[213]  Being named a defendant in an analogous action would

---

[211] *See Horman v. Abney*, 2017 WL 242571, at *7 (Del. Ch. Jan. 19, 2017) ("Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so." (quoting *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007))).

[212] *South v. Baker*, 62 A.3d 1, 17 (Del. Ch. 2012) (citing *Wood v. Baum*, 953 A.2d 136, 142 (Del. 2008); *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *22–23 (Del. Ch. Oct. 12, 2011); *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 126–28 (Del. Ch. 2009); *Rattner v. Bidzos*, 2003 WL 22284323, at *12–13 (Del. Ch. Oct. 7, 2003); *Desimone*, 924 A.2d at 938).

[213] Compl., ¶¶ 120, 217–18.  This includes Director Defendants Kandarian, Grisé, Kilts, Hubbard, and Kinney, all of whom except Kandarian were on the Demand Board.  *Id.* ¶ 216.

provide directors with notice.[214] It is therefore reasonable to infer that four directors—a minority—on the Demand Board had actual knowledge of the underlying regulatory issues. The Plaintiffs specifically argue, however, that the implicated directors never made a report of this to the full Board.[215]

In the absence of specific factual allegations, as required under Rule 23.1, the Plaintiffs require too many attenuated inferences to traverse from regulatory guidance and settlements on the part of the Company, to bad faith on the part of any director with regard to the Pension Risk Transfer Business. First, I would have to infer that a majority of the Board had actual notice of the regulatory actions, when the alleged facts only indicate that four members of the Demand Board had notice. Then, I would have to infer that the Board was aware of positive law violations, or that inaction would permit such violations, despite the fact that the regulatory guidance does not point to a positive law violation, and that MetLife specifically denied such violations in the RSA. After this, I would have to make the inference that the Board took this knowledge of regulatory action and positive law violation and understood that the same infirmities could be present in "administrative

---

[214] *See In re Fitbit, Inc. S'holder Derivative Litig.*, 2018 WL 6587159, at *16 (Del. Ch. Dec. 14, 2018), *aff'd sub nom. Fitbit, Inc. v. Agyapong*, 202 A.3d 511 (Del. 2019) ("Defendants' exposure in the federal Securities Action is also a relevant factor in the Rales analysis.").

[215] Pls.' Answering Br., at 38–39 ("When they were named as defendants in that case in 2012 . . . they, or general counsel, should have alerted the rest of the Board that the Company and its directors and officers faced a substantial likelihood of personal liability for the unlawful RIS conduct that was afoot . . . [i]t does not appear that this happened." (internal citations omitted)).

45

procedures in an analogous line of business."[216]  Then, finally, I would have to infer from the absence of reform to these procedures in the "analogous line of business" that the Board *in bad faith* ignored the red flags.

Such a line of inferences cannot not hold up under the demanding Rule 23.1 analysis, which requires specific factual allegations in order to draw an inference of bad faith on the part of directors.  "Demand will be excused only where the facts alleged, together with reasonable inferences therefrom, if true make it substantially likely that any illegality on the part of the Company arose from the directors' bad faith."[217]  Here, what the Plaintiffs have alleged supports an inference of failure of prudence on the part of the Defendants; and a lack of imagination, perhaps, sufficient to understand the need to reform outworn administrative practices in one line of business given similar deficiencies in another line.  I cannot, however, draw the inference that the regulatory actions were red flags that any director, assuming she had notice, consciously disregarded in bad faith.  Therefore, the regulatory actions cannot serve as a basis for a substantial likelihood of liability.

---

[216] *See* Compl., ¶ 118.

[217] *Kandell ex rel FXCM, Inc. v. Niv*, 2017 WL 4334149, at *2 (Del. Ch. Sept. 29, 2017).

### 2. "Red Flag" 7 (The Internal Auditor's Report) and "Red Flag" 5 (The Department of Labor Investigation and MetLife's Pilot Program)

The second group of purported "red flags" include the allegation that in September 2016, MetLife's Chief Auditor presented the Audit Committee with the Internal Auditor's Report.[218] That report stated:

> [C]ontrol weaknesses were identified over several areas, including contract accuracy, manual certificate mailings, and retirement letter mailings (e.g. age 65 and 70.5). Opportunities exist to enhance existing controls to ensure timely processing of held and suspended payments as well as retirements. Additionally, management should enhance procedures to clearly identify when transaction processing for a contract transfers to the Closeout Administration team.[219]

The Internal Auditor's Report set a year-end target date to address the "control weaknesses."[220] The Audit Committee did not follow up, and there is no indication that the Report was brought to the attention of the Board.[221] Three members of the Demand Board were present at the Audit Committee meeting and reviewed the Internal Auditor's Report.[222]

---

[218] Compl., ¶ 128.

[219] *Id.* ¶ 130.

[220] *Id.* ¶ 132.

[221] *See id.* ¶ 133 ("based on the minutes produced in response to the 220 Demands, the Audit Committee . . . took no further action regarding the identified deficiency."); Pls.' Answering Br., at 35 ("There is no evidence that the Audit Committee reported these control weakness findings to the full Board.").

[222] *Id.* ¶ 131. "Director Defendants Sicchitano, Grisé, Kinney, Kelly, Jr., and Kelly, III" were present. *Id.* Of these five, three—Grisé, Kinney, and Kelly, III—are on the Demand Board.

The Complaint also alleges that, around the same time period as the Internal Auditor's Report, the United States Department of Labor opened an investigation into pensioners' reporting that pensions were going unpaid, and that MetLife responded to the investigation by creating a "Pilot Program" for the Pension Risk Transfer Business.[223] The Pilot Program eventually showed that the two-letter notification system was inadequate, and proposed new methods to identify and pay annuitants.[224] The Board reviewed these findings in January 2018.[225] By that point, MetLife had publicly announced (a month before, in December 2017), the shortcomings in its Pension Risk Transfer Business.[226] Within a month of the Board's review of the Pilot Program, the Company announced it would revise earnings, issued public apologies, and undertook remedial measures.[227] Clearly, the Board had notice of the DOL investigation and the Pilot Program in January 2018, and MetLife identified, disclosed, and responded to the problem.

To recapitulate, several pertinent things occurred shortly before the time MetLife filed the Form 8-K identifying weaknesses in its recognition of and payment to Pension Risk Transfer annuitants, in late 2017. In September of the prior year,

---

[223] *Id.* ¶¶ 121, 123.

[224] *Id.* ¶ 122.

[225] *Id.*

[226] *Id.* ¶ 154.

[227] *Id.* ¶¶ 154, 157, 161, 164.

the internal auditor informed the Audit Committee, with three members of the MetLife Demand Board, about control weaknesses in the Pension Risk Transfer Business, with a target to address the weaknesses by the end of 2016. The Audit Committee failed to follow up thereafter. About this time, Company management became aware of DOL's investigation of pensioners' complaints, and the Company set up a "Pilot Program" to address ways of tracking and paying Pension Risk Transfer annuitants. That Pilot Program demonstrated the insufficiency of the two-letter notice system. The Board reviewed the Pilot Program's finding in January, 2018, just after the Company filed the form 8-K identifying material weakness in the Pension Risk Transfer Business. A few weeks later, the Company revised earnings and addressed the problems. Then, in February 2018, the NYDFS brought a regulatory action that resulted in the 2019 settlement.

The question before me is not whether the Director Defendants could have saved the Company from embarrassment, fines and securities litigation had the Board been informed of weaknesses at the time of the Internal Auditors' Report, and taken prompt action. I can infer that those things would have happened. My analysis must be whether, given the scenario alleged in the Complaint and described above, I may conclude a substantial likelihood of liability on the Directors' part. That likelihood, in turn, must depend on the Director Defendants acting in conscious disregard of their duties. A failure to undertake immediate remediation of a reported

49

defect, even where immediate action would be wise, is not evidence of bad faith unless it implies a need to act so clear that to ignore it implies a conscious disregard of duty. Such a failure, obviously, can only occur with knowledge of the defect. In the scenario described above, drawing all reasonable inference in favor of the Plaintiffs, the implication of bad faith is absent.[228]

In sum, the Plaintiffs do not offer specific factual allegations from which I can reasonably infer that the Board was aware of red flags and ignored them in bad faith. As a result, the allegations do not support a reasonable inference of *Caremark* liability. Given that the Board does not face a substantial likelihood of liability from Counts I and II, it is capable of reviewing those claims on behalf of the Company.[229] Thus, the Plaintiffs' failure to make a demand on the Board is fatal to these claims, and they must be dismissed.

---

[228] The allegation closest to stating indifference in the face of a duty to act is that the Audit Committee failed to ensure that the remediation called for in the Internal Auditor's Report was implemented, and its failure to bring the Internal Auditor's Report to the attention of the full board. Only three members of the Demand Board were present at the delivery of the Internal Auditor's Report to the Audit Committee, and so even to the extent that presentation of the Report implied a duty to act, failure to comply would taint only a minority of the Demand Board.

[229] As noted previously, the Plaintiffs do not allege that any Director Defendant lacked independence from management, and so the Board could have brought its business judgment to bear in review of the allegations of bad faith brought against MetLife officers in Count II.

*B. Counts III through V: Unjust Enrichment and Waste*

In Counts III and IV of the Complaint, the Plaintiffs assert unjust enrichment claims against the Director and Officer Defendants.[230] Count V is related; it charges the Director Defendants with waste in failing to claw back compensation paid unjustly to the Officer Defendants. The Plaintiffs allegation in Count III (against the Director Defendants) is that the Director Defendants, having failed in their oversight duties, nonetheless "were awarded lavish compensation that did not account for their roles in subjecting the Company" to penalties and lawsuits related to the Pension Risk Transfer Business.[231] In other words, the unjust enrichment claim against the Director Defendants is premised on the unjustness of compensation in light of the Director Defendants' bad-faith failure of oversight. Since I have found that the Plaintiffs have failed to establish the likelihood of the latter, I must conclude that the former claim is likely to fail as well. In similar circumstances, this Court has found that "[t]he unjust enrichment claim . . . is thus properly conceived as a form of additional damages dependent on the plaintiff proving the oversight claim. . ."[232] To evaluate a demand to bring these unjust enrichment claims, the Board would have to first evaluate the validity of the underlying oversight claims. A Rule 23.1 analysis

---

[230] Compl., ¶¶ 249–63.

[231] *Id.* ¶¶ 249–52.

[232] *Hughes v. Hu*, 2020 WL 1987029, at *17 (Del. Ch. Apr. 27, 2020).

for the unjust enrichment claim "thus necessarily treads the same path as the demand futility analysis . . . implicate[s] the same conduct," and, therefore, obtains the same result.[233] Given my finding above that the Demand Board is capable of reviewing a demand for the breach of fiduciary duty claims, it is also capable of reviewing the unjust enrichment claims. In that case, obviously, the Board could evaluate the unjust enrichment claims against management as well, thus demand is not excused for the waste and Officer Defendant unjust enrichment claims.[234]

## IV. CONCLUSION

The Defendants' Motion to Dismiss under Rule 23.1 is granted based on the Plaintiffs' failure to make a demand on the MetLife Board prior to filing the derivative Complaint. An appropriate order is attached.

---

[233] *Id.* at *18. The Plaintiffs acknowledge this in their briefing. *See* Pls.' Answering Br., at 58 ("These unjust enrichment claims spring entirely from the alleged breaches of fiduciary duty. . .").

[234] I confess to not fully understanding the waste claim. Corporate waste occurs when a company trades assets for consideration of no value, or so little value as to make the exchange beyond the range of reason. *E.g. Weiss v. Swanson*, 948 A.2d 433, 450 (Del. Ch. 2008). If the claim here is that the Director Defendants failed to bring an action to attempt to recoup salary and benefits paid to faithless officers of the Company, that does not state a claim of waste.

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| IN RE METLIFE INC. DERIVATIVE LITIGATION | ) <br> ) Consol. C.A. No. 2019-0452- <br> ) SG <br> ) |

## <u>ORDER</u>

AND NOW, this 17th day of August, 2020, for the reasons set forth contemporaneously in the attached Memorandum Opinion dated August 17, 2020, IT IS HEREBY ORDERED that the Defendants' Motion to Dismiss is GRANTED.

IT IS SO ORDERED.

<u>/s/ Sam Glasscock III</u>

Vice Chancellor